## MARYLAND CASUALTY CO. v. DUHON et al.

### No. 2061.

Court of Civil Appeals of Texas. Beaumont.
June 15, 1931.

Rehearing Denied July 1, 1931.

Chas. D. Smith, of Beaumont, for appellant.

Tom C. Stephenson and Jas. A. Harrison, both of Beaumont, for appellees.

WALKER, J.

This was a compensation case tried in the district court on appeal from an adverse award of the Industrial Accident Board, with appellees as plaintiffs and appellant as defendant. Appellees are the wife and surviving children of Tobe Duhon. Appellant pleaded the nature of Tobe Duhon's injuries as follows:

"That on or about the 12th day of November, A. D. 1927, while Tobe Duhon was engaged in the course of his employment with the said Uvalde Rock Asphalt Company, on a bridge job on what is known as Lake Pontchartrain, in Louisiana, the said Tobe Duhon, sustained personal injuries, in the manner and to the extent hereinafter more specifically set out:

"On or about the 12th day of November, A. D. 1927, at about two (2) o'clock P. M. while working on said bridge job, as aforesaid, and over said lake as aforesaid, a fire broke out on or near said bridge by reason of some tar being ignited and while the said Tobe Duhon was fighting said fire, and rolling a barrel of gasoline out of said fire, he fell over another barrel of gasoline, severely bruising and injuring his side, stomach, back, ribs, and kidneys; also receiving internal bruises, injuries and lacerations to such extent that an abscess developed from said bruises and injuries which later resulted in the death of the said Tobe Duhon, on or about the 2nd day of October, A. D. 1929, in Beaumont, Jefferson County, Texas, which city and county had been his home and place of residence for more than five (5) years."

Among other defenses, appellant answered by general and special demurrers and general denial. Answering special issues, the jury found that Tobe Duhon received (1) personal injuries on the 12th day of November, 1927, (2) in the course of his employment, (3) which resulted in his death, (4) facts entitling appellees to a lump sum settlement, (5) upon a discount of 6 per cent. Judgment was accordingly entered in appellees' favor.

It was shown without controversy that Tobe Duhon was, at the time of his death, and for five or six years continuously prior thereto, an employee of Uvalde Rock Asphalt Company, which company was a subscriber under the Workmen's Compensation Act, and carried its compensation insurance with appellant; that Tobe Duhon gave due notice of his claimed injuries, claim was duly filed before the Industrial Accident Board, the claim adjudicated adversely to the contention of appellees, who gave due notice of their dissatisfaction with the award of the board and duly filed this suit as an appeal from the award.

Appellant has many assignments of error, but it is necessary to discuss only the assignment, which we sustain, that the verdict of the jury to the effect that Tobe Duhon received personal injuries in the course of his employment, which resulted in his death, was wholly without support in the evidence. The facts on this issue are as follows:

Philip Papelo testified:

"Yes, sir. I was right there on the bridge on the 12th day of November. Well, on that date we had a kettle heating asphalt in it and it got too hot and it caught fire. It made a

great big fire. It set the bridge on fire. Up until the time of the fire Tobe was healthy then. Tobe took part or helped to put out the fire and moved the gasoline. Tobe is the only one that worked in that fire. I did not help Tobe. I wasn't helping in that fire. It was too much fire for me. Tobe Duhon just moved the barrels: And the company had a lot of tools and things around there and he moved it all out of the way. To move those barrels he had to go in the fire and smoke.

"Well, after that day, to my appearance he didn't look to be the same man. I couldn't tell how he felt though. No sir, he didn't look like the same man. Right about the time of the fire or about the time it was over Tobe Duhon did not make any statement to me."

J. D. Clifford, superintendent of Uvalde Rock Asphalt Company, testified:

"I remember when he went down to Louisiana on this construction job on Lake Pontchartrain; he went down there the early part of November. We sent him down there on that job: The Uvalde Rock Asphalt Company sent him down there. The immediate foreman over him over there on that work was a man by the name of Nolan. I believe Nolan was in charge of the work. A big fellow they called Jim Nolan. Mr. Allen was over there in charge when he was over there. He was immediately over him when he was over there. He was the foreman immediately over him. Tobe was an asphalt raker. That was his regular job. That requires skill and ability. He was very good at that kind of work. Something happened over there on or about the 12th day of November to the bridge that they were working on. We had an asphalt fire. The asphalt caught fire. Well, on that particular occasion I happened to be on the bridge when they had the fire. They were using straight asphalt, that is number 35. We put the asphalt in the pot or kettle and melt or break it up and we cut it with gasolene. We put the asphalt in the pot and heat it up and cut it with gasolene and melt it up into a liquid. We have to melt it to 150 or 200 degrees Fahrenheit, and then they apply gasolene to finish so they could apply it. On that day they were melting this asphalt in the pot. We had a lot of gasolene drums on the bridge which we were using to cut this asphalt. If I remember correctly, I am not positive, but there were several drums of it on the opposite side from the kettle. That gasolene had to be moved out of the way. Anybody that was there was supposed to move it out of the way. Anybody that is there it is a part of their duties to go in and remove it. I am positive that this man Trahon or Duhon assisted. I said I was positive that he did help to roll those barrels out, because I happened to be standing there at that particular time

and was helping myself. I was over there that one particular day. I did not see Tobe Duhon any more after that fire until he was relieved down there and he came back to Beaumont, which was the latter part of January, 1928. At that time he was sickly, that is, he appeared sick. When he came back he didn't report to me immediately. As a matter of fact he didn't report until the 4th or 5th of February. I went to see him in the meantime in January or February. The first time I saw him was February the 4th or 5th. He reported at the office. At that time he was weak that is all. He was complaining. He did not go to work. He attempted to work one day after that. He just worked the one day. I went to his house after that to see him. I would find him in bed when I would go there. I found him in bed every time that I went there. I think I went there three or four times—three or four different times. I did not see him after he died. On the day of the fire and almost immediately after the fire I did not hear Tobe Trahon ask Mr. Nolan to give him a bottle of liniment. Mr. Nolan is located in Houston at this time. Houston is his headquarters.

"* * * The bridge was about 20 feet wide. The container took up about five or six feet of it, just about five or six or seven feet of space between the container itself and the barrels of gasolene and other materials that they had on there. They had other things on there, materials, tools and stuff like that. They had a lot of tools and other material laying all around there. I would guess off hand that they had eight or ten barrels of gasolene on that bridge. Those eight or ten barrels of gasolene were within a few feet of that fire. All of the hands took hold and removed the combustibles and inflammables that were close to the fire. The fire did not spread but remained in the vicinity of the container. It over-flowed across the top of the container and we kept it in the vicinity of the kettle.. It over-flowed and we held it just in the immediate vicinity of the kettle. It was in flames. I suppose the flames were eight or ten feet high in the air and there was a tremendous amount of smoke. The smoke went up above the flames. There was not a great cloud of smoke down on the ground. It was very similar to any other oil fire. It is a heavy black smoke. The smoke was up above the flames. The flames went up I suppose eight or ten feet high in the air and then the smoke was up above the flames. I don't know all of the gang that helped to move that gasolene. I just know a few of our men that were there. I was there, yes sir. I don't know how many men were around there. No, I don't exactly know who all was at that fire.

"* * * Tobe Duhon first gave me or the

company notice of this injury in February, the early part of February. Yes, that was the first notice. Yes sir, after he came back—when he reported to me at the plant. The notice that he gave me was that he told me that he had been injured on the job. I am superintendent of the company and was at that time."

Mr. L. J. Allen, an employee of Uvalde Rock Asphalt Company, testified:

"Q. I believe you stated while ago that he worked a while over there after the fire on the 12th? A. Yes, sir.

"Q. During the time that he worked was he well or complaining during the time that he worked?

"By Mr. Smith: I object to that your Hon.

"By the Court: Overrule the objection.

"By Mr. Smith: Note my exception.

"By Judge Harrison: Go ahead and answer the question.

"By Mr. Smith: Will the court permit me to enlarge my bill, or shall I state them all right now?

"By the Court: Yes sir. Oh, yes sir. Just a minute. Judge Harrison, is it all right for Mr. Smith to enlarge on his bill later on, or shall he state it right now?

"By Judge Harrison: Oh, no sir, he can have a full bill.

"By Mr. Smith: Then note my exception. And I have the privilege of enlarging my bill.

"A. Well, he would be feeling bad, and I told him I thought it was caused by him smoking too much. I told him, I said 'Tobe, if you don't quit smoking that pipe you are going to die' and he said 'no, he thought it was from inhaling that smoke' and he finally quit smoking the pipe.

"Q. What smoke was he talking about? A. They had a fire over there on the job I suppose before I got there.

"By Mr. Smith: I object to that because there is no pleading to sustain the testimony. I object to it further because it is not responsive to the question. It is also hearsay and self serving.

"By the Court: I think probably I will sustain the objection. I sustain the objection.

"By Mr. Smith: I should think so. And we ask that the court exclude the testimony and instruct the jury not to consider it.

"By the Court: The testimony is not responsive, and the jury is instructed, or I will instruct them not to consider what Mr. Allen said with reference to that question.

"At the time, or along about the time when I saw him at work over there—I don't think there was any question but what he was sick."

" * * * I was not at the fire myself; I was in Beaumont. I don't know anything about that particular fire except by hearsay.

" * * * I told Tobe that he was smoking that old pipe too much and he had better stop smoking or it was going to kill him."

The wife of Tobe Duhon testified:

"During my husband's illness and before his death I had occasion to rub him with liniments and feel of his side. I felt something in his left side; he had a big lump in his left side; it appeared to be about that large (indicating) right there, and as it went up here it looked like it went to a sharp edge. The whole side was swollen and a kind of sharp point on this side right there. I could see that it was swollen through his stomach, and he suffered awfully with it. I observed that swelling when he first came home. It was there when he first came home. It just grew all the time. It got larger and larger all the time. When he died his stomach was swollen like that (indicating).

" * * * Just as soon as he got in about 5:00 o'clock he went to bed and I called the doctor about 7:00 o'clock. I called Doctor McMicken. I will name all the doctors that ever attended him. Doctor McMicken, Doctor Grimes and Doctor Darwin. I know a doctor by the name of Doctor Tyler. Yes, Doctor Tyler also come to see him. Oh, yes sir, after he come back here in January I remember that Doctor Barr looked at him; Doctor McMicken had Doctor Barr to come and look at him. That was the old Doctor Barr that come to see him. Doctor Darwin treated him continually from May up until his death. He died on the 3rd day of October, 1929. It was the 2nd, yes sir, instead of the 3rd."

Lewis Finney, an undertaker who qualified by a correspondence course, testified:

"I embalmed Tobe Duhon's body after his death. There was no autopsy performed on him by any doctor or doctors before I embalmed him that I know of. I examined him closely. I didn't see where his stomach had been cut open. As an embalmer I did not cut into him, I only punctured his spleen with a trocar.

" * * * I embalmed his body immediately after he died. I embalmed his body the same day he died. Immediately after he died I embalmed him. I drew something out of the spleen with the trocar. I only pulled out some clogged dark like blood; it was ropey like.

" * * * I drew out some clogged like black blood, ropey blood. That clogged like black ropey blood came from the spleen. In my experience as an undertaker and embalmer I have witnessed and observed spleens that have had abscesses on them. I would say that I have observed some four other cases. Well, I will state the condition of the spleen: It was a kind of tumor like. It was hard. It seemed like it was tough and I had trouble in puncturing it."

Appellant offered no testimony. As we con-

strue the evidence, appellees wholly failed to raise the issue that the injury received by Tobe Duhon on the 12th of November, 1927, contributed in the least to his death, almost two years thereafter. The evidence affirmatively excludes any possibility that he fell or stumbled over barrels, or any other object, because he was in plain view of the other employees all during the fire and no one testified to the injury. The record shows that he was treated by some of the most eminent physicians in the city of Beaumont, but yet no doctor was called to testify as to the cause of his death. There was no evidence that the smoke or the heat or the extra exertion in moving the barrels contributed in any way to the enlarged spleen or to the condition of the spleen testified to by the undertaker. It is a reasonable conclusion that appellees would have offered their doctors as witnesses if the doctors could have testified to any favorable fact or circumstance. We say this, not to detract in the least from the probative force of all the circumstances in evidence, but only to show that appellees have fully developed their case and that there is no reasonable probability that it could be strengthened upon another trial. From what has been said it follows that the judgment of the lower court must be reversed and the cause here rendered in favor of appellant.

■ Appellees have suggested in their brief that we cannot consider appellant's assignments of error complaining of the refusal of the trial court to instruct a verdict in their behalf and that the verdict of the jury has no support because they say these assignments were waived by appellant in the lower court. The facts under this suggestion are as follows: On the 3d of July, 1930, appellant filed its original motion for new trial, raising the assignments of error just discussed. On the 23d day of July, 1930, appellant filed an amendment or addition to the original motion for new trial, as follows: "Comes now Maryland Casualty Company, defendant, in the above styled and numbered cause, and, pursuant to the order of the Court duly made and entered on the docket of the said Court, hereby amends its original motion for a new trial duly filed herein, by adding to the said motion for a new trial the following added reasons, grounds and assignments of error numbered consecutively after No. 13, the last numbered assignment of error in the said motion for a new trial, viz." The original motion for new trial contained thirteen assignments of error. The new assignments added by the amendment to the original motion were numbered 14, 15, and 16, and the amendment was filed under due authority of court. The order overruling the motion for new trial contained the following recitation: "This day came on to be heard defendant's original mo-

tion for new trial filed herein on July 3, 1930, and the additional grounds for motion for new trial added thereto by way of amendment filed herein July 23, 1930, and said motion and amendment are hereby in all things overruled as one instrument, constituting defendant's motion for new trial. * * *"

We think the statement made shows clearly that it was not the intention of appellant, in filing the amendment to its original motion for new trial, to abandon the original motion, but only to add thereto the three additional grounds. It is also clearly appears from the order of the court that in the judgment of the court the original motion continued before it for adjudication was never withdrawn or superseded, but that the amendment was treated only as presenting additional assignments of error.

Reversed and rendered.